# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| TAMMY ECHOLS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )        1:22CV480 |
| | ) |
| KILOLO KIJAKAZI, | ) |
| Acting Commissioner of Social | ) |
| Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Plaintiff, Tammy Echols, brought this action pursuant to the Social Security Act (the "Act") to obtain judicial review of a final decision of Defendant, the Acting Commissioner of Social Security, denying Plaintiff's claim for Disability Insurance Benefits ("DIB"). (Docket Entry 1.) Defendant has filed the certified administrative record (Docket Entry 5 (cited herein as "Tr. __")), and both parties have moved for judgment (Docket Entries 9, 13; see also Docket Entry 10 (Plaintiff's Memorandum); Docket Entry 12 (Defendant's Brief)). For the reasons that follow, the Court should remand this matter for further administrative proceedings.

## I.  PROCEDURAL HISTORY

Plaintiff applied for DIB (Tr. 482-91), alleging a disability onset date of November 8, 2017 (see Tr. 482, 485). Upon denial of that application initially (Tr. 245-60, 313-21) and on

reconsideration (Tr. 261-76, 323-30), Plaintiff requested a hearing de novo before an Administrative Law Judge ("ALJ") (Tr. 331-32). Plaintiff, her attorney, and a vocational expert ("VE") attended the hearing. (Tr. 212-44.) The ALJ subsequently ruled that Plaintiff did not qualify as disabled under the Act. (Tr. 277-94.) The Appeals Council thereafter granted Plaintiff's request for review (Tr. 300-05, 389-92, 606-10), and remanded the matter back to the ALJ to "[e]valuate [Plaintiff]'s headache condition to determine its severity and impact, if any[,] on [Plaintiff]'s ability to perform work-related activities in accordance with Social Security Ruling 19-4p[, Titles II and XVI: Evaluating Cases Involving Primary Headache Disorders, 2019 WL 4169635 (Aug. 26, 2019) ('SSR 19-4p')]" (Tr. 302).

The ALJ convened a new hearing, attended by Plaintiff, her attorney, and a VE. (Tr. 181-211.) The ALJ thereafter issued a decision deeming Plaintiff not disabled under the Act (Tr. 15-38), and Plaintiff requested review of that decision with the Appeals Council (Tr. 462-64, 622-31). The Appeals Council denied review (Tr. 1-7), thereby making the ALJ's ruling the Commissioner's final decision for purposes of judicial review.

In rendering that decision, the ALJ made the following findings later adopted by the Commissioner:

1. [Plaintiff] meets the insured status requirements of the . . . Act through December 31, 2022.

2

2.   [Plaintiff] has not engaged in substantial gainful activity since November 8, 2017, the alleged onset date.

3.   [Plaintiff] has the following severe impairments: spine disorder; dysfunction of major joints; chronic pain syndrome; and headaches.

. . .

4.   [Plaintiff] does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

. . .

5.   . . . [Plaintiff] has the residual functional capacity to perform light work . . . .  In an eight-hour workday, she can sit for six hours and stand as well as walk for three hours.  With the use of the left upper extremity, she can frequently push; pull; feel; and reach overhead and all other directions. Additionally, she can frequently crouch and occasionally stoop.  However, she can never crawl or climb ramps and stairs.

. . .

6.   [Plaintiff] is capable of performing past relevant work as a Medical Analyst and Medical Intake.  This work does not require the performance of work-related activities precluded by [Plaintiff]'s residual functional capacity.

. . .

7.   [Plaintiff] has not been under a disability, as defined in the . . . Act, from November 8, 2017, through the date of this decision.

(Tr. 20-37 (bold font and internal parenthetical citations omitted).)

## II. DISCUSSION

Federal law "authorizes judicial review of the Social Security Commissioner's denial of social security benefits." Hines v. Barnhart, 453 F.3d 559, 561 (4th Cir. 2006). However, "the scope of . . . review of [such a] decision . . . is extremely limited." Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). Even given those limitations, the Court should remand this case for further administrative proceedings.

### A. Standard of Review

"[C]ourts are not to try [a Social Security] case de novo." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974). Instead, "a reviewing court must uphold the factual findings of the ALJ [underlying the denial of benefits] if they are supported by substantial evidence and were reached through application of the correct legal standard." Hines, 453 F.3d at 561 (internal brackets and quotation marks omitted).

"Substantial evidence means 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Hunter v. Sullivan, 993 F.2d 31, 34 (4th Cir. 1992) (quoting Richardson v. Perales, 402 U.S. 389, 390 (1971)). "It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001) (internal brackets and quotation marks omitted). "If there is evidence to justify a refusal to direct a verdict were the

4

case before a jury, then there is substantial evidence." <u>Hunter</u>, 993 F.2d at 34 (internal quotation marks omitted).

"In reviewing for substantial evidence, the [C]ourt should not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the [ALJ, as adopted by the Social Security Commissioner]." <u>Mastro</u>, 270 F.3d at 176 (internal brackets and quotation marks omitted). "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Social Security Commissioner] (or the ALJ)." <u>Id.</u> at 179 (internal quotation marks omitted). "The issue before [the Court], therefore, is not whether [the claimant] is disabled, but whether the ALJ's finding that [the claimant] is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law." <u>Craig v. Chater</u>, 76 F.3d 585, 589 (4th Cir. 1996).

When confronting that issue, the Court must take note that "[a] claimant for disability benefits bears the burden of proving a disability," <u>Hall v. Harris</u>, 658 F.2d 260, 264 (4th Cir. 1981), and that, in this context, "disability" means the "'inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months,'" <u>id.</u>

5

(quoting 42 U.S.C. § 423(d)(1)(A)).[1] "To regularize the adjudicative process, the Social Security Administration [('SSA')] has . . . promulgated . . . detailed regulations incorporating longstanding medical-vocational evaluation policies that take into account a claimant's age, education, and work experience in addition to [the claimant's] medical condition." Id. "These regulations establish a 'sequential evaluation process' to determine whether a claimant is disabled." Id. (internal citations omitted).

This sequential evaluation process ("SEP") has up to five steps: "The claimant (1) must not be engaged in 'substantial gainful activity,' i.e., currently working; and (2) must have a 'severe' impairment that (3) meets or exceeds the 'listings' of specified impairments, or is otherwise incapacitating to the extent that the claimant does not possess the residual functional capacity [('RFC')] to (4) perform [the claimant's] past work or (5) any other work." Albright v. Commissioner of Soc. Sec. Admin., 174 F.3d 473, 475 n.2 (4th Cir. 1999).[2] A finding adverse to the claimant at any of several points in the SEP forecloses an award

---

[1] The Act "comprises two disability benefits programs. [DIB] . . . provides benefits to disabled persons who have contributed to the program while employed. The Supplemental Security Income Program . . . provides benefits to indigent disabled persons. The statutory definitions and the regulations . . . for determining disability governing these two programs are, in all aspects relevant here, substantially identical." Craig, 76 F.3d at 589 n.1 (internal citations omitted).

[2] "Through the fourth step, the burden of production and proof is on the claimant. If the claimant reaches step five, the burden shifts to the [government] . . . ." Hunter, 993 F.2d at 35 (internal citations omitted).

and ends the inquiry.  For example, "[t]he first step determines whether the claimant is engaged in 'substantial gainful activity.' If the claimant is working, benefits are denied.  The second step determines if the claimant is 'severely' disabled.  If not, benefits are denied." <u>Bennett v. Sullivan</u>, 917 F.2d 157, 159 (4th Cir. 1990).

On the other hand, if a claimant carries his or her burden at each of the first three steps, "the claimant is disabled." <u>Mastro</u>, 270 F.3d at 177.  Alternatively, if a claimant clears steps one and two, but falters at step three, i.e., "[i]f a claimant's impairment is not sufficiently severe to equal or exceed a listed impairment, the ALJ must assess the claimant's [RFC]." <u>Id.</u> at 179.[3]  Step four then requires the ALJ to assess whether, based on that RFC, the claimant can "perform past relevant  work"; if so, the claimant does not qualify as disabled.  <u>Id.</u> at 179-80.  However, if the claimant establishes an inability to return to prior work, the analysis proceeds to the fifth step, whereupon the ALJ must decide "whether the claimant is able to perform other work considering

---

[3] "RFC is a measurement of the most a claimant can do despite [the claimant's] limitations." <u>Hines</u>, 453 F.3d at 562 (noting that administrative regulations require RFC to reflect claimant's "ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis . . . [which] means 8 hours a day, for 5 days a week, or an equivalent work schedule" (internal emphasis and quotation marks omitted)).  The RFC includes both a "physical exertional or strength limitation" that assesses the claimant's "ability to do sedentary, light, medium, heavy, or very heavy work," as well as "nonexertional limitations (mental, sensory, or skin impairments)." <u>Hall</u>, 658 F.2d at 265.  "RFC is to be determined by the ALJ only after [the ALJ] considers all relevant evidence of a claimant's impairments and any related symptoms (<i>e.g.</i>, pain)." <u>Hines</u>, 453 F.3d at 562-63.

7

both [the RFC] and [the claimant's] vocational capabilities (age, education, and past work experience) to adjust to a new job." <u>Hall</u>, 658 F.2d at 264-65. If, at this step, the government cannot carry its "evidentiary burden of proving that [the claimant] remains able to work other jobs available in the community," the claimant qualifies as disabled. <u>Hines</u>, 453 F.3d at 567.[4]

## B. Assignments of Error

Plaintiff asserts that the Court should overturn the ALJ's finding of no disability on these grounds:

1) "[t]he ALJ's failure to properly account for the work-related limitations that would result from [Plaintiff]'s headache disorder in the RFC is harmful error" (Docket Entry 10 at 5 (bold font and single-spacing omitted)); and

2) "[t]he new and material evidence in [Plaintiff]'s claim supports a conclusion that remand for further consideration is appropriate" (<u>id.</u> at 18 (bold font and single-spacing omitted)).

Defendant contends otherwise and seeks affirmance of the ALJ's decision. (<u>See</u> Docket Entry 12 at 10-22.)

---

[4] A claimant thus can qualify as disabled via two paths through the SEP. The first path requires resolution of the questions at steps one, two, and three in the claimant's favor, whereas, on the second path, the claimant must prevail at steps one, two, four, and five. Some short-hand judicial characterizations of the SEP appear to gloss over the fact that an adverse finding against a claimant on step three does not terminate the analysis. <u>See, e.g.</u>, <u>Hunter</u>, 993 F.2d at 35 ("If the ALJ finds that a claimant has not satisfied any step of the process, review does not proceed to the next step.").

8

## 1. Evaluation of Headaches

In Plaintiff's first issue on review, she maintains that "[t]he ALJ's failure to properly account for the work-related limitations that would result from [Plaintiff]'s headache disorder in the RFC is harmful error." (Docket Entry 10 at 5 (bold font and single-spacing omitted).) More specifically, Plaintiff contends that "the ALJ fail[ed] to clearly identify what impact [Plaintiff's] headaches, and accompanying symptoms and medication side effects, [] ha[d] on her ability to perform work-related activities and account for them in the RFC as the ALJ was directed to do in the [Appeals Council's] remand order." (Id. at 6.)[5] In that regard, Plaintiff notes that "there is no appreciable difference between the ALJ's RFC conclusion in [her first decision] in August 2020 and her RFC conclusion in [her post-remand decision] in October 2021." (Id.; see also id. at 6-7 (comparing language of 2020 and 2021 RFCs (citing Tr. 29, 288)).) In Plaintiff's view, "the frequency of her headaches, the related symptoms including the medication side effects of fatigue and drowsiness she experience[d] would [have], at a minimum, result[ed] in off-task behaviors, a

---

[5] Plaintiff additionally argues "that the ALJ's failure to perform the function-by-function assessment and provide a 'narrative discussion describing how the evidence supports' the ALJ's conclusions as required by [Social Security Ruling 96-8p, Policy Interpretation Ruling Titles II and XVI: Assessing Residual Functional Capacity in Initial Claims, 1996 WL 374184 (July 2, 1996) ('SSR 96-8p')] is error." (Docket Entry 10 at 13-14 (quoting SSR 96-8p, 1996 WL 374184, at *7); see also id. at 14-15 (citing, inter alia, Thomas v. Berryhill, 916 F.3d 307, 311 (4th Cir. 2019), Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018), Monroe v. Colvin, 826 F.3d 176, 189 (4th Cir. 2016), and Mascio v. Colvin, 780 F.3d 632, 636 (4th Cir. 2015)).)

need for unscheduled work breaks and unscheduled absenteeism at a frequency that would [have] preclude[d] competitive work[, which wa]s consistent with her testimony and other reports in the record." (Id. at 8; see also id. at 8-10 (detailing her subjective statements and evidence she believes supported the inclusion of work-preclusive RFC restrictions (citing Tr. 191-92, 194-95, 198-99, 201, 223-24, 229-31, 545, 547, 551, 564, 569, 582, 851, 859, 893, 915, 928-29, 937, 943, 1027-28, 1287, 1435-36, 1454-55, 1458-61)).) Plaintiff further contests the sufficiency of the ALJ's explanation for rejecting Plaintiff's assertion that her headaches would cause her to miss at least one day of work per week. (See id. at 10-13.) For the reasons explained more fully below, Plaintiff's contentions have merit and warrant remand.

RFC measures the most a claimant can do despite any physical and mental limitations. Hines, 453 F.3d at 562; 20 C.F.R. § 404.1545(a). An ALJ must determine a claimant's exertional and non-exertional capacity only after considering all of a claimant's impairments, as well as any related symptoms, including pain. See Hines, 453 F.3d at 562-63; 20 C.F.R. § 404.1545(b). The ALJ then must match the claimant's exertional abilities to an appropriate level of work (i.e., sedentary, light, medium, heavy, or very heavy). See 20 C.F.R. § 404.1567. Any non-exertional limitations may further restrict a claimant's ability to perform jobs within an exertional level. See 20 C.F.R. § 404.1569a(c).

An ALJ need not discuss every piece of evidence in making an RFC determination.  See Reid v. Commissioner of Soc. Sec., 769 F.3d 861, 865 (4th Cir. 2014).  However, "the ALJ must both identify evidence that supports his [or her] conclusion and build an accurate and logical bridge from that evidence to [that] conclusion."  Woods v. Berryhill, 888 F.3d 686, 694 (4th Cir. 2018) (internal emphasis, quotation marks, and brackets omitted).  As to the role of the function-by-function analysis in that determination, the relevant administrative ruling states: "The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis. . . .  Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy."  SSR 96-8p, 1996 WL 374184, at *1.

The Fourth Circuit has addressed this administrative ruling and the issue of whether an ALJ's failure to articulate a function-by-function analysis necessitates remand.  See Mascio v. Colvin, 780 F.3d 632, 636–37 (4th Cir. 2015).  Specifically, the court stated "that a per se rule is inappropriate given that remand would prove futile in cases where the ALJ does not discuss functions that are irrelevant or uncontested," id. at 636 (internal quotation marks omitted), but that "'remand may be appropriate where an ALJ fails to assess a claimant's capacity to perform

11

relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review,'" id. (internal brackets and ellipsis omitted) (quoting Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013)). Here, although the Court should find that the ALJ both complied with the Appeals Council's remand order and conducted the proper function-by-function analysis, the ALJ's evaluation of Plaintiff's headache disorder nonetheless warrants remand, because the ALJ's decision fails to supply the necessary "accurate and logical bridge," Woods, 888 F.3d at 694 (internal quotation marks omitted), between the evidence and her findings that Plaintiff's headache disorder (A) qualified as a severe impairment at step two of the SEP (see Tr. 20), but (B) would not cause Plaintiff to miss at least one day of work per week (see Tr. 29, 35).

With regard to Plaintiff's headache disorder, the ALJ provided the following analysis:

> Notably, MRI imaging of the cervical spine from October 28, 2020, showed mild non-compressive disc bulge and right-sided facet arthritis, which was assessed as a possible cause or [sic] regional discomfort - rather than radiating discomfort. Repeat MRI imaging of the head was also performed on October 28, 2020. The clinical impression did not show any appreciable change from the July of 2018 study that was performed over three years [sic] earlier.

> Despite the imaging findings, [Plaintiff] reported that she had experienced thirty headache days in the month preceding the appointment on April 21, 2021. While this was a noted increase from her report at an earlier visit and the in file headache log, she subjectively described her ability to function with her medication as

12

'fair/average' despite intermittent drowsiness as a medication side effect. Overall, her statement of function on April 21, 2021 is consistent with improvement because she previously described her ability to function as "not so good" on January 4, 2021.

. . .

The [ALJ] also notes that upon inquiry during the August 25, 2021 hearing [Plaintiff] testified that the frequency of her headaches had increased since her initial accident in November of 2017. Notably, she also expressly stated that prior to worsening the "medication could keep it under control [because] if it start[ed] coming on and [she] t[ook] the medication it would go away with the exception of the severe ones." She went on to state that the medications were not as effective. With the addition of Topiramate, [Plaintiff] stated that her headaches did not resolve but instead made her feel sleepy though she was reportedly unsure how long she slept during the day. While [Plaintiff] testified that she experienced significant difficulties in her day-to-day activities and stated that she relied on her husband and daughter for assistance with self-care, driving, and chores due to exertional, postural, and manipulative limitations, her testimony was not forthcoming regarding the care that she provided for her twenty-month-old grandchild – which she readily reported to her provider the previous month.

. . .

[The "PHYSICAL Residual Function Capacity Medical Source Statement" dated April 12, 2021 by Ayeshia C. Powell, NP, ("Nurse Powell") and Dr. Kofi Doonquah] vaguely refers to the proposed frequency of the unscheduled breaks and does not outline a basis for the assessed limitations in off-task behavior and absenteeism beyond general [sic] noting that the conclusion was reached based on [Plaintiff]'s history, medical file, progress notes, physical examinations, and imaging. Thus, the April 21, 2021 opinion is minimally persuasive.

Based on the foregoing, the [ALJ] finds [Plaintiff] has the above [RFC] assessment, which is supported by the record. The [RFC] restriction to light exertional tasks with left upper extremity limitations accounts for [Plaintiff]'s headaches and related symptoms. . . . In making this finding, the [ALJ] considered SSR 19-4p as

13

well as the hypothetical limitations proposed by [Plaintiff]'s representative during the hearing. On the basis of [Plaintiff]'s January 4, 2021 assertion that she experienced headaches greater than fifteen days in a thirty-day period and her hearing testimony, her representative asserted that [Plaintiff] would require unscheduled absences at least one day per week, which would include times where she would need to leave early, arrive late, or miss an entire day of work, secondary to fifteen or more "severe" headache days in a thirty-day period. However, <u>SSR 19-4p expressly states that a finding of disability will not be 'based on a person's statement of symptoms alone.' Nevertheless, the [ALJ] fully considered [Plaintiff]'s longitudinal history of treatment engagement for headaches and reports of pain</u>.

<u>By [Plaintiff]'s own testimony, she had not experienced fifteen "severe" headache days consistently dating back to her alleged onset date of disability</u>. In fact, she testified that previously her medication "could keep [the headaches] under control [because] if it start[ed] coming on and she took the medication it would go away with the exception of the severe ones." However, as of the date of the hearing, she stated that she "just ha[d] headaches regardless of what." Notably, [<u>Plaintiff]'s purportedly contemporaneous headache log from September of 2020 through October of 2020 did not document daily headaches</u> and expressly indicated that her symptoms were "mild" on at least four days and only required her to remain in bed "all day" on one occasion. <u>Furthermore, on October 28, 2020, [Plaintiff] underwent an MRI of the cervical spine and the findings revealed mild findings. Furthermore, MRI imaging of the head also from October 28, 2020 did not show any appreciable change from July of 2018. Later, on July 1, 2021, [Plaintiff] reported that she had been caring for her twenty-month-old grandson despite her difficulties</u>. Overall, the totality of the evidence does not support a finding that the severity and frequency of the headaches as well as medication side effects would result in unscheduled absences at least one day per week.

(Tr. 32-35 (emphasis added) (internal parenthetical citations omitted).)

As the above-quoted language makes clear, the ALJ <u>did</u> evaluate the impact of Plaintiff's headache disorder in accordance with the

14

Appeals Council's remand order _and_ on a function-by-function basis. The ALJ explicitly noted that, to account for Plaintiff's headaches, the RFC included limitations on lifting, carrying, pushing, pulling, reaching, and feeling (_see_ Tr. 35), but did not include absence from work at least once per week (_see_ Tr. 34-36). Thus, the question before the Court narrows to whether the ALJ supported those findings with substantial evidence. For the reasons that follow, the Court should find that the ALJ did not.

Plaintiff first faults the ALJ for "dismiss[ing] the impact of [Plaintiff's] headaches . . . because . . . SSR 19-4p 'expressly states that a finding of disability will not be "based on a person's statement of symptoms alone."'" (Docket Entry 10 at 11 (quoting Tr. 35 (in turn quoting SSR 19-4p, 2019 WL 4169635, at *2)).) Plaintiff notes that the quoted language in SSR 19-4p cites to 20 C.F.R. § 404.1529 (_see_ _id._ (citing SSR 19-4p, 2019 WL 4169635, at *2 n.10)) which, in turn, "sets forth a two-step framework for evaluating a claimant's symptoms" (_id._), as well as that "[t]he ALJ concluded earlier in the decision that [Plaintiff's] headaches were a severe impairment that could reasonably be expected to produce the pain and other symptoms alleged" (_id._ at 11-12 (citing Tr. 30)).

As Plaintiff correctly observes, because the ALJ had already made the part one finding under Section 404.1529 in Plaintiff's favor (_see_ Tr. 30), the ALJ had thereby found the existence of

15

objective medical evidence of a headache disorder that could reasonably cause the pain and other symptoms alleged by Plaintiff and thus the ALJ would not have based any finding regarding the disabling effects of Plaintiff's headaches on her subjective statements alone. In Arakas v. Commissioner of Soc. Sec. Admin., 983 F.3d 83 (4th Cir. 2020), the United States Court of Appeals for the Fourth Circuit "reiterate[d] the long-standing law in [that C]ircuit that disability claimants are entitled to rely exclusively on subjective evidence to prove the severity, persistence, and limiting effects of their symptoms," Arakas, 983 F.3d at 98 (emphasis added). In other words, under the appropriate circumstances, an ALJ may choose to rely exclusively on a claimant's subjective symptom reports to find disabling symptoms.[6] Accordingly, to the extent the ALJ intended to convey that SSR 19-4p barred her from basing the part two determination regarding the intensity, persistence, and limiting effects of Plaintiff's headache symptoms on her subjective statements alone, the ALJ erred.

---

[6] Arakas, however, does not compel ALJs to consider only subjective evidence, as such a requirement would conflict with both the Act and its implementing regulations, which plainly require ALJs to consider a variety of factors, including objective medical evidence, in evaluating the intensity, persistence, and limiting effects of symptoms. See 42 U.S.C. § 423(d)(5)(A) ("Objective medical evidence of pain . . . established by medically acceptable clinical or laboratory techniques (for example, deteriorating nerve or muscle tissue) must be considered in reaching a conclusion as to whether [an] individual is under a disability." (emphasis added)); 20 C.F.R. § 404.1529(c) (directing ALJs to assess a claimant's medical history, medical signs and laboratory findings, daily activities, testimony about nature and location of pain, medication and other treatment used to alleviate pain, along with medical opinions from examining and non-examining sources).

Next, Plaintiff asserts "that the 'inconsistencies' identified by the ALJ are not supported on closer review." (Docket Entry 10 at 12.) More specifically, Plaintiff points out that, "in July 2021[, she] did report caring for her 20 month old grandson at [a] doctor visit," but that "the ALJ fail[ed] to note that [Plaintiff] reported that the child's mother left town and that 'in [Plaintiff's] physical condition[,]' caring for her grandson had been very difficult." (Id. (citing Tr. 35, and quoting Tr. 1460).) Plaintiff further observes that "[h]er treatment provider . . . wrote a letter to support [Plaintiff] with assistance with childcare in the daytime while her husband [wa]s at work." (Id. (citing Tr. 1460-61).) According to Plaintiff, "th[at] evidence, when considered in context, reveals that [Plaintiff] was not able to care for her 20-month old grandson independently as a result of her combined impairments." (Id.; see also id. (citing Woods, 888 F.3d at 694-95, for proposition that "[a]n ALJ may not consider the type of activities the claimant can perform without also considering the extent to which she can perform them").)

On balance, the Court should find that, in evaluating the severity of Plaintiff's symptoms, the ALJ placed too much significance on the presence of Plaintiff's grandson in her home and failed to consider the qualifying facts surrounding his care by Plaintiff. Although the ALJ correctly observed that Plaintiff did

not mention her grandson's presence in her home at the hearing on August 25, 2021 (see Tr. 32 (finding Plaintiff's "testimony [] not forthcoming regarding the care that she provided for her twenty-month-old grandchild – which she readily reported to her provider the previous month"); see also Tr. 186 (reflecting Plaintiff's response "[m]y husband[]" to ALJ's question "[w]ho live[d] with [her]?")), the ALJ neglected to acknowledge that 1) Plaintiff apparently did not choose to take custody and care of her grandson, as the record reflects that the child's mother abandoned him in Plaintiff's home (see Tr. 1460); 2) Plaintiff described the unexpected burden of caring for the child with Plaintiff's physical limitations as "difficult" to her neurology providers (id.); and 3) Plaintiff procured a letter from her neurology providers to assist her with obtaining daytime child care for the child (see Tr. 1461).[7]  Viewed in the proper context, this involuntary, approximately three-month time period that Plaintiff's grandson required her care during the daytime while her husband worked, and which caused her "difficult[y]" (Tr. 1460), reasonably could not have significantly countered Plaintiff's "testi[mony] that she experienced significant difficulties in her day-to-day activities and [] that she relied on her husband and daughter for assistance

---

[7] Although the ALJ did not review subsequent records from Plaintiff's neurologist that she submitted to the Appeals Council, those records reflect that, by September 23, 2021, Plaintiff had placed her grandson in daycare, "which ha[d] relieved a lot of stress off of her."  (Tr. 148.)

18

with self-care, driving, and chores due to exertional, postural, and manipulative limitations" (Tr. 32).

Additionally, Plaintiff challenges the salience of the ALJ's observation that Plaintiff "admitt[ed] in her 'own testimony' that [she] had not experienced fifteen severe headache days consistently dating back to her [alleged onset date of disability]." (Docket Entry 10 at 12 (quoting Tr. 35).) Plaintiff contends that her "headache condition has progressively worsened over the course of her claim" and thus that her "testimony that her headaches have worsened over time – and become less responsive to medication – appears to be consistent with the overall treatment records" (id.).

The ALJ pointed out that, at the hearing, Plaintiff's attorney relied on Plaintiff's August 25, 2021, hearing testimony and her "January 4, 2021 assertion that she experienced headaches greater than fifteen days in a thirty-day period . . . [to] assert[] that [Plaintiff] would require unscheduled absences at least one day per week." (Tr. 35 (referencing Tr. 210, 1435).) The ALJ further noted that Plaintiff testified that "previously her medication 'could keep [the headaches] under control [because] if it start[ed] coming on and she took the medication it would go away with the exception of the severe ones.'" (Id. (purporting to quote Tr. 194).) The ALJ thus observed that, "[b]y [Plaintiff]'s own testimony, she had not experienced fifteen 'severe' headache days

19

consistently dating back to her alleged onset date of disability"
(id.).

As an initial matter, the ALJ construed Plaintiff's testimony
regarding the progression of her headaches out of context. The
following exchange took place between Plaintiff and her attorney at
the hearing:

Q    . . . [I]n going back to, you know, when you had
your accident, when you stopped working in November
of 2017, not quite four years ago, in terms of the
severe    headaches    over    the    last    four
years, . . . has the frequency of the severe
headaches been about the same, have they gotten
more frequent, have they gotten less frequent over
the last four years, or what?

A    More frequent. Because I used to could go like
four days. It would be like maybe four times a
week. Now, I'm having 'em every day now.

Q    Okay. Now you're having some kind of headache
every day. Whereas, used to, you could go several
days without any headache, is that what you're
saying?

A    Without feeling severe headaches. It wasn't where
you could –

Q    Okay.

A    You know, let me put it like this. The medication
could keep it under control. If it start coming
on, and I take the medication, it will go away
except if it's a severe one. But now I just have
headaches [INAUDIBLE]. They just stay.

Q    Okay. So, the medications are not as effective as
they used to be.

A    Yes.

20

(Tr. 193-94 (emphasis added).)  Fairly read, Plaintiff's testimony reflects that, even before the frequency of her severe headaches increased to a daily occurrence, she experienced up to four severe headaches per week that medication could not fully control, which could translate to more than 15 severe headache days per month.[8]

Moreover, Plaintiff complained of headaches to her orthopedists in February 2018 (see Tr. 859), July 2018 (see Tr. 850), and July 2019 (see Tr. 893 (resulting in referral to headache specialist)), reported "continuous[]" left-sided headaches rated eight out of ten on the pain scale with photophobia to consultative examiner Dr. Steven Burgess on January 28, 2019 (Tr. 824), alleged between 10 and 18 severe headaches and between 10 and 18 moderate headaches in a four-week period during all four of her visits to Dr. Marshall C. Freeman at the Headache and Wellness Center from August to October 2019 (see Tr. 915, 923, 930, 937), as well as asserted that she experienced no days in a 30-day period without a headache to her neurology provider in November 2020 (see Tr. 1439). Because Plaintiff's testimony and the record evidence reflect that she reported frequent, severe headaches throughout a majority of the relevant period in this case, the ALJ's observation that Plaintiff did not allege having 15 severe headaches days per month dating back to her onset date (see Tr. 35) does not provide a

_____

[8] Other aspects of Plaintiff's testimony indicating that, at times, "several days" (Tr. 194) could go by "without feeling severe headaches" (id.) would still translate into severe headaches at least eight days a month.

21

sufficient rationale to reject Plaintiff's assertion that her headaches would cause her to miss at least one day of work per week.

Plaintiff next contests the ALJ's reliance on Plaintiff's "headache log" to discount her subjective complaints of disabling headaches. (Docket Entry 10 at 13 (referencing Tr. 35, and citing Tr. 1287).) The ALJ deemed "[n]otabl[e]" that Plaintiff's "purportedly contemporaneous headache log from September of 2020 through October of 2020 did not document daily headaches and expressly indicated that her symptoms were 'mild' on at least four days and only required her to remain in bed 'all day' on one occasion." (Tr. 35.) As Plaintiff argues, however, her "headache log . . . only covered a period of 19 days" and, "[w]ithin that period[, she] noted 11 moderate to severe headache days including at least [one] for which she stayed in bed all day, [four] mild headaches and [four] days that appear to have been free of headaches." (Docket Entry 10 at 13 (emphasis added) (citing Tr. 1287).) Given that the headache log covered only 19 days of a relevant period spanning nearly four years, as well as the fact that Plaintiff testified that her headaches had increased in frequency over time (see Tr. 194), the log's contents, documenting 15 out of 19 days with some degree of headache in the fall of 2020, did not provide a sound basis for the ALJ to reject Plaintiff's

22

assertion that her headaches would cause her to miss work at least once per week.

Plaintiff also objects to the ALJ's reliance on "mild cervical MRI findings and stable imaging of her brain as evidence [Plaintiff's] headaches [we]re not as severe as alleged." (Docket Entry 10 at 13 (referencing Tr. 35, 1391-92, 1399-1400).) In that regard, Plaintiff points out that "SSR 19-4p . . . specifically notes that imaging scans are used to 'rule out other possible causes of headaches . . . meaning that an unremarkable MRI is consistent with a primary headache disorder diagnosis' and that imaging 'may be useful in ruling out other possible causes of headache symptoms.'" (Id. (quoting SSR 19-4p, 2019 WL 4169635, at *4).)

In this case, the record does not establish whether Plaintiff has a primary headache disorder, i.e., "headaches [that] occur independently and are not caused by another medical condition," SSR 19-4p, 2019 WL 4169635, at *3, or a secondary headache disorder, i.e., "headaches [that] are symptoms of another medical condition such as fever, infection, high blood pressure, stroke, or tumors," id. Plaintiff's providers have questioned whether her cervical disc disease caused and/or contributed to her headaches (see Tr. 1028), as well as whether her on-the-job fall onto her left side caused "some type of neuralgia following a physically traumatic insult" (Tr. 1460; see also id. (deeming it "still unclear what

23

[wa]s causing [Plaintiff's] issues")). In light of that uncertainty as to the cause of Plaintiff's headaches, her cervical spine MRI (which showed disc bulges and facet arthritis (see Tr. 1392)) and head MRI (which revealed numerous foci of T2 and FLAIR signal in Plaintiff's white matter leading to a differential diagnosis of small vessel disease versus demyelinating disease versus migraine versus vasculitis (see Tr. 1400)) did not provide a compelling ground for the ALJ to discount the severity of Plaintiff's headaches.

In short, the ALJ complied with the Appeals Council's remand order and conducted a function-by-function analysis of the impact of Plaintiff's headaches on her ability to function, but did not support that analysis with substantial evidence, warranting remand.

### 2. New and Material Evidence

In Plaintiff's second and final assignment of error, she contends that "[t]he new and material evidence in [her] claim supports a conclusion that remand for further consideration is appropriate." (Docket Entry 10 at 18 (bold font and single-spacing omitted).) In particular, Plaintiff asserts that "a diagnosis of multiple sclerosis [('MS')] was confirmed in December 2021" (id. at 19 (citing Tr. 113-15)), and that "[t]he basis for her diagnosis appear[ed] to be MRI imaging of her brain on December

24

14, 2021" (id. (referencing Tr. 121))[9] and "exam findings including generalized weakness, increased muscle tone of the cervical paraspinal muscles and upper trapezius muscles, reduced motor strength at 4/5 of the left lower extremity, diminished upper extremity reflexes and brisk lower extremity reflexes" (id. (citing Tr. 115) (collectively "New MS Evidence"). According to Plaintiff, "[r]emand for new and material evidence is appropriate where four prerequisites are met[:] . . . (1) '[the evidence] must be relevant to the determination of disability at the time the application was first filed and not merely cumulative[; ] (2) [the evidence must be] material to the extent that the [Commissioner]'s decision might reasonably have been different had the new evidence been before her['; (3) Plaintiff must make] a showing of 'good cause for [her] failure to submit the evidence when the claim was before the [Commissioner';] . . . and [(4) Plaintiff] must present to the remanding court at least a general showing of the nature of the new evidence." (Id. at 18 (quoting Borders v. Heckler, 777 F.2d 954, 955 (4th Cir. 1985)) (internal quotation marks and citations omitted).) In Plaintiff's view, "the new evidence satisfies all four of the requirements necessary to establish that it is new and material evidence (id. at 19), and that "[r]emand for further consideration [of the new evidence] by the ALJ is appropriate" (id.

_____

[9] Plaintiff cited transcript page 122 as containing the MRI of her head (see Docket Entry 10 at 19 (citing Tr. 122)), but that report actually appears at page 121 (see Tr. 121).

25

at 21).  For the reasons more fully explained below, the Court should remand this matter for the ALJ to consider the New MS Evidence under sentence four of 42 U.S.C. § 405(g).

As an initial matter, the parties appear to disagree whether sentence _four_ or _six_ of Section 405(g) constitutes the proper authority under which to evaluate the New MS Evidence.  (_Compare id._ at 18 (arguing that New MS Evidence satisfies the four requirements under _Borders_ for sentence _six_ remand), _with_ Docket Entry 12 at 19 (contending that, "where evidence is tendered only to the Appeals Council, the [C]ourt reviews the full record, including the Appeals Council submission, to test the ALJ's decision for substantial evidence," which represents standard under sentence _four_ of Section 405(g) (citing _Meyer v. Astrue_, 662 F.3d 700, 704 (4th Cir. 2011), and _Wilkins v. Secretary, Dep't of Health & Human Servs._, 953 F.2d 93, 96 (4th Cir. 1991)))).  The choice between those two types of remands turns on whether the Appeals Council has already _considered_ the new evidence and _incorporated_ that evidence into the record before the Court.  Where the Appeals Council has considered and incorporated the new evidence, the Court must address the new evidence under sentence _four_ of Section 405(g).  _See Meyer_, 662 F.3d at 704 (noting that court would apply sentence _four_ standard and "review the record as a whole including any new evidence that the Appeals Council specifically _incorporated_ . . . into the administrative record" (emphasis added) (internal

26

quotation marks omitted)); <u>Wilkins</u>, 953 F.2d at 96 ("The Appeals Council specifically <u>incorporated</u> [the treating psychiatrist]'s letter . . . into the administrative record. Thus, we must review the record as a whole, including the new evidence, in order to determine whether substantial evidence supports the [Commissioner]'s findings." (emphasis added)). In contrast, if the Appeals Council declined to consider and to incorporate the new evidence into the record, the Court must evaluate the new evidence under sentence <u>six</u> of Section 405(g). <u>See</u> <u>Shalala v. Schaefer</u>, 509 U.S. 292, 297 n.2 (1993) ("Sentence-six remands may be ordered . . . where new, material evidence is adduced that was for good cause not presented before the agency." (citations omitted)); <u>Farrell v. Astrue</u>, 692 F.3d 767, 770 (7th Cir. 2012) ("Evidence that has been rejected by the Appeals Council cannot be considered [under sentence four] to reevaluate the ALJ's factual findings."). As described more fully below, the circumstances surrounding the Appeals Council's handling of the New MS Evidence favors a finding that the Appeals Council <u>considered</u> and <u>incorporated</u> that evidence into the record and thus that the Court should evaluate that evidence under the sentence <u>four</u> framework.

Plaintiff's counsel requested review with the Appeals Council on December 17, 2021 (Tr. 462-64) and, on December 20, 2021, the Appeals Council sent Plaintiff's counsel a letter acknowledging the request for review and allowing Plaintiff 25 days to submit

27

"additional evidence" that "is new, material, and relates to the period on or before the date of the hearing decision." (Tr. 10.) Additionally, the Appeals Council advised Plaintiff's counsel that she "must also show there is a reasonable probability that the additional evidence would change the outcome of the [ALJ's] decision," as well as "good cause for why [Plaintiff] missed informing [the SSA] about or submitting it earlier." (Id.)[10] Thereafter, Plaintiff's counsel submitted the New MS Evidence to the Appeals Council (see Tr. 112-15, 121), along with arguments that the evidence qualified as "new and material" and "require[d] remand" (Tr. 628 (bold font omitted)).[11]

The New MS Evidence consists of an MRI of Plaintiff's head on December 14, 2021, which showed:

> [s]cattered foci of T2 hyperintensity within the white matter of the cerebral hemisphere including deep, juxta cortical and periventricular white matter. <u>Several small foci are new since prior MRI in the bilateral frontal lobes</u>. No enhancing lesion identified. No posterior fossa or callosal lesion. Differential diagnosis include[s] demyelinating disease, chronic microangiopathic changes, vasculitis, autoimmune and other inflammatory/infectious processes.

---

[10] On February 8, 2022, the Appeals Council granted Plaintiff's request for another 30 days to submit arguments or new evidence. (See Tr. 8-9, 624.)

[11] The record does not divulge the date on which Plaintiff's counsel sent the new evidence to the Appeals Council, but she must have sent it between the dates of the new evidence (December 14, 2021 (see Tr. 121) and December 16, 2021 (see Tr. 112-15)), and the date of the Appeals Council's decision denying review (April 27, 2022 (see Tr. 1)). Additionally, Plaintiff's counsel sent in other new evidence to the Appeals Council (see Tr. 51-111, 117-120, 122-80), which the Appeals Council declined to exhibit (see Tr. 2, 5-6). Plaintiff did not include such other evidence in her arguments before this Court that new evidence requires remand. (See Docket Entry 10 at 18-21.) As such, the Court should not consider such other new evidence further.

28

(Tr. 121 (emphasis added).) The New MS Evidence also includes a post-MRI visit to Highland Neurology on December 16, 2021 (see Tr. 112-15), at which Nurse Powell documented "increased muscle tone [left greater than right] to [Plaintiff's] cervical paraspinal muscles and upper trapezius," "4/5" strength in Plaintiff's hip flexion, biceps, triceps, and dorsiflexion on the left, "diminished" deep tendon reflexes in Plaintiff's upper extremities and "pathologically brisk" deep tendon reflexes in Plaintiff's lower extremities. (Tr. 115.) Nurse Powell offered the following analysis of the MRI of Plaintiff's head:

> I reviewed MRI brain images and compared this to the one last year with Dr. Doonquah who comments that there are no active lesions however [Plaintiff's] lesion burden is great and may have increased from the last exam however there are so many lesions it is difficult to tell. The conclusion is this is likely MS and should be treated. I called [Plaintiff] after her visit once a plan was devised. I spoke to her about MS and the goals of treatment to reduce further disability. She comments that she is 50 [years old] and dependent on using a cane to ambulate and the chronic pain, headaches, decreased mobility as well as balance issues have taken a toll on her quality of life. She says that her sister has MS and the prospects scare her so she is ready for treatment. [] All questions/concerns were addressed. It was recommended by the physician that [Plaintiff] try either tecfidera or Kesempta.

(Tr. 114 (emphasis added).)[12]

The Appeals Council denied Plaintiff's request for review on April 27, 2022, remarking as follows:

---

[12] Plaintiff reports "that she was awarded [DIB] with an onset date of December 14, 2021[,] consistent with the confirmation of her [MS] diagnosis on a subsequent application for benefits." (Docket Entry 10 at 20 (citing Docket Entry 10-2).)

> [Plaintiff] submitted evidence from Highland Neurology, November 18, 2021 through December 17, 2021, 55 pages and Cone Health, December 14, 2021, 26 pages. The ALJ decided your case through October 20, 2021. <u>This additional evidence does not relate to the period at issue</u>. Therefore, <u>it does not affect the decision</u> about whether you were disabled beginning on or before October 20, 2021.

(Tr. 2 (emphasis added).) Consistent with the language emphasized above, the Appeals Council noted that it "ha[d] received additional evidence which it [<u>wa]s making part of the record</u>," that "consist[ed] of . . . [the <u>r]equest for review</u> from [Plaintiff's counsel] received December 17, 2021," a "[<u>r]epresentative brief</u> from [Plaintiff's counsel] dated December 17, 2021," a "[<u>r]epresentative brief</u> from [Plaintiff's counsel] dated January 8, 2022," and a "[<u>r]epresentative brief</u> from [Plaintiff's counsel] dated March 10, 2022," which the Appeals Council exhibited as "Exhibit B30," "Exhibit 17E," "Exhibit 18E," and "Exhibit 19E," respectively (Tr. 5 (emphasis added); <u>see also</u> Tr. 462-64 (Ex. 30B - request for review), 622-23 (Ex. 17E - brief), 624-27 (Ex. 18E - brief), 624-27 (Ex. 19E - brief)). Although the Appeals Council did <u>not</u> include the New MS Evidence on the list of items it "ma[de] part of the record" (Tr. 5), it appears in the administrative transcript before this Court immediately following the Appeals Council's decision denying review and bears transcript page numbers 112 through 115 and 122 (<u>see</u> Tr. 112-15, 122), consistent with administrative guidance, <u>see Hearings, Appeals, and Litigation Law Manual</u> ("HALLEX"), § I-3-5-20 ("Evaluation of Additional Evidence"

30

(Dec. 16, 2020) (providing that Appeals Council "will <u>evaluate</u> all additional evidence it receives, but will <u>only</u> mark as an exhibit and <u>make a part of the official record</u> additional evidence it determines meets the requirements of 20 [C.F.R. §] 404.970(a)(5)-(b)," but that such evidence "will be included in the <u>certified administrative record</u> if the case is appealed to Federal court" (emphasis added)).

That chain of events presents the Court with two possible interpretations of the state of the record. On one hand, the Court could find that the Appeals Council 1) <u>considered</u> the New MS Evidence by examining it and then finding that it "d[id] not relate to the period at issue" and "d[id] not affect the decision about whether [Plaintiff] w[as] disabled beginning on or before October 20, 2021" (Tr. 2), and 2) <u>incorporated</u> the New MS Evidence into the record by including it in the administrative transcript before this Court immediately following the decision denying review (<u>see</u> Tr. 112-15, 122), such that Section 405(g)'s sentence <u>four</u> should apply. On the other hand, the Court could view the Appeals Council's refusal to "mak[e the New MS Evidence] part of the record" (Tr. 5) as an indication that the Appeals Council <u>neither considered nor incorporated</u> the New MS Evidence into the record, thereby making sentence <u>six</u> the appropriate framework for decision. <u>See</u> <u>Patricia C. v. Berryhill</u>, No. 4:17CV58, 2019 WL 254981, at *2 & n.3 (W.D. Va. Jan. 2, 2019) (unpublished) (observing that, where

31

Appeals Council found new evidence "did not show a reasonable probability that it would change the outcome of the [ALJ's] decision" and "did not consider and exhibit th[e new] evidence," but copy of that evidence appeared in administrative transcript before the court, "[t]he Commissioner's practice of mixing into the certified copy of the record evidence that her agency has expressly refused to 'consider and exhibit[]' present[ed] an awkward procedural posture for judicial review" and, because the court "might [in the future] have to choose which part of § 405(g)'s text — sentence four or sentence six — governs th[e c]ourt's authority to review the Commissioner's final decision[,] . . . the [c]ourt welcome[d] the parties' input on how best to proceed under § 405(g) when the Commissioner files a certified transcript of the record of the underlying administrative proceedings that contains evidence the Appeals Council has explicitly declined to accept, consider, and/or incorporate into that record" (internal citations omitted)), recommendation adopted sub nom. Coleman v. Berryhill, 2019 WL 254672 (W.D. Va. Jan. 17, 2019) (unpublished).

Further complicating matters, the Fourth Circuit has evaluated cases pursuant to both sentence four and sentence six when confronted with new evidence first presented to the Appeals Council. Compare Wiebusch v. Commissioner, Soc. Sec. Admin., No. 20-1590, 2022 WL 2965653, at *2-3 (4th Cir. July 27, 2022) (unpublished) (reviewing case under sentence four standard where

32

Appeals Council found new evidence consisting of treating physician questionnaire did not show reasonable probability it would change outcome of ALJ's decision but <u>not</u> addressing sentence six or whether Appeals Council had considered or incorporated new evidence), <u>with</u> <u>Jackson v. Astrue</u>, 467 F. App'x 214, 218 (4th Cir. 2012) (holding that, where Appeals Council rejected new evidence because it "d[id] not provide a basis for changing the [ALJ]'s decision[,] . . . [the court's] proper disposition is to remand pursuant to sentence <u>six</u> of § 405(g) which authorizes a remand upon a showing of new material evidence" (emphasis added)).

District courts within the Fourth Circuit similarly take different approaches to cases involving new evidence presented to (but not exhibited by) the Appeals Council. <u>See, e.g.,</u> <u>Montoya v. Kijakazi</u>, No. 1:20CV1157, 2022 WL 562945, at *7 (M.D.N.C. Jan. 11, 2022) (unpublished) (Webster, M.J.) (deciding case under sentence <u>four</u> framework because "[the p]laintiff appear[ed] to be seeking a sentence <u>four</u> remand," where Appeals Council failed to acknowledge new evidence submitted by the plaintiff and thus that evidence <u>did not appear in administrative transcript</u>, but also noting that "analysis and result [] would essentially be the same even if [the p]laintiff sought a remand pursuant to sentence <u>six</u>" (emphasis added)), <u>recommendation adopted</u>, 2022 WL 561533 (M.D.N.C. Feb. 24, 2022) (unpublished) (Biggs, J.); <u>Sales v. Saul</u>, No. 1:19CV476, 2020 WL 4735308, at *4 (M.D.N.C. Aug. 14, 2020) (unpublished) (Webster,

33

M.J.) (where "[the p]laintiff submitted additional information to the Appeals Council . . .[, and t]he Appeals Council determined that such evidence d[id] not show a reasonable probability that it would change the outcome of the [ALJ's] decision," but included the new evidence in the Court's administrative transcript, "the Court conclude[d] that the proper course [ wa]s to remand this matter [under sentence <u>four</u> of 42 U.S.C. § 405(g)] for further administrative proceedings." (internal quotation marks and citations omitted)), <u>recommendation adopted</u>, slip op. (M.D.N.C. Sept. 1, 2020) (Eagles, J.); <u>Donald C. v. Saul</u>, No. 5:18CV63, 2019 WL 9056721, at *11 (W.D. Va. Aug. 19, 2019) (unpublished) (finding that, because Appeals Council concluded that newly submitted evidence did not raise reasonable probability of changing outcome of case and "<u>did not consider and exhibit</u> th[at] evidence," the plaintiff's contention regarding the new evidence constitutes "an argument that the case should be remanded under sentence <u>six</u> of 42 U.S.C. § 405(g) to enable the Commissioner to consider additional evidence in the first instance" (emphasis added)); <u>Lauder v. Saul</u>, No. 1:18CV480, 2019 WL 3457706, at *9-10 (M.D.N.C. July 31, 2019) (unpublished) (Peake, M.J.) (denying remand under sentence <u>four</u> because "no meaningful possibility [existed] - much less a reasonable probability - that the additional evidence would change the outcome of the decision," even where Appeals Council did not <u>exhibit</u> new evidence because it "d[id] not relate to the period at

34

issue" but new evidence <u>appeared in administrative transcript</u>), <u>recommendation adopted</u>, slip op. (M.D.N.C. Aug. 22, 2019) (Eagles, J.); <u>Johnson v. Acting Comm'r of Soc. Sec. Admin.</u>, No. 9:18CV90, 2019 WL 2717860, at *6 n.4 (D.S.C. June 27, 2019) (unpublished) ("The Appeals Council ultimately decided that . . . it would <u>not</u> <u>'consider' or 'exhibit'</u> the evidence because there was not a reasonable probability it would change the outcome of the case . . . . The Appeals Council therefore denied review and would not consider this new evidence *after* making a determination that the medical records provided no basis to change the ALJ's decision. Further, the medical records are included in the transcript and noted as 'Medical Evidence of Record.' Accordingly, this remand is appropriate under sentence <u>four</u> of 42 U.S.C. § 405(g)." (underscoring added) (italics in original)); <u>Coleman v. Berryhill</u>, No. 6:17CV2613, 2019 WL 850902, at *5 (D.S.C. Feb. 22, 2019) (unpublished) (noting that Appeals Council did not incorporate new evidence into the record, but finding sentence <u>four</u> remand appropriate "because it was an error of law [for the Appeals Council] to not consider and exhibit such evidence"); <u>Hawks v. Berryhill</u>, No. 1:17CV1021, 2018 WL 6728037, at *5 n.6, *8 n.9 (M.D.N.C. Dec. 21, 2018) (unpublished) (noting that the plaintiff did not request sentence <u>six</u> remand and could "not argue [for a sentence <u>four</u> remand based on the fact] that the [new evidence], when considered as part of the administrative record as a whole,

35

render[ed] the ALJ's decision unsupported by substantial evidence[,] . . . because . . . the Appeals Council declined to incorporate the [new evidence] into the administrative record" (emphasis added)), recommendation adopted, 2019 WL 359999 (M.D.N.C. Jan. 29, 2019) (unpublished) (Schroeder, C.J.); Jones v. Berryhill, No. 1:17CV703, 2018 WL 3849914, at *6-7 (M.D.N.C. Aug. 13, 2018) (unpublished) (denying remand under sentence six where Appeals Council found new evidence "d[id] not show a reasonable probability that it would change the outcome of the decision" and "did not consider and exhibit th[e new] evidence," and administrative transcript before the Court did not contain new evidence), recommendation adopted, slip op. (M.D.N.C. Sept. 4, 2018) (Schroeder, C.J.); Brown v. Colvin, No. 7:14CV283, 2015 WL 7307320, at *6 (E.D.N.C. Oct. 27, 2015) (unpublished) ("To the extent that the lack of formal incorporation of the additional evidence into the record signifies that it remains outside the record, notwithstanding its inclusion in the transcript of proceedings, this evidence is appropriately treated as having been submitted for the first time to th[e] court and therefore as being subject to sentence six of 42 U.S.C. § 405(g)," but also finding that "[r]emand [wa]s [] warranted [under sentence four] if the [new evidence was] deemed to have become part of the record by virtue of the Appeals Council's consideration of [it], even if not formally

36

incorporated into the record" (emphasis added)), <u>recommendation</u>
<u>adopted</u>, 2015 WL 7306453 (E.D.N.C. Nov. 19, 2015) (unpublished).

On balance, three facts before the Court in this case favor
analyzing Plaintiff's New MS Evidence under the sentence <u>four</u>
framework. First, unlike in <u>Hawks</u> and <u>Jones</u>, the New MS Evidence
appears in the administrative transcript before the Court, albeit
in the "Court Transcript Index" portion rather than the "Exhibits"
portion of the record (<u>see</u> Tr. 112-15, 122). The inclusion of the
New MS Evidence in the Court's official record of proceedings lends
support to the notion that the Court can consider it as part of a
sentence <u>four</u> analysis. See <u>Harvey v. Berryhill</u>, No. CV 0:18-48,
2019 WL 2062446, at *3-5 (D.S.C. Feb. 25, 2019) (unpublished)
(remanding case under sentence <u>four</u> where Appeals Council found new
evidence "d[id] not relate to the period at issue" but included new
evidence in the court's administrative transcript), <u>recommendation</u>
<u>adopted sub nom. Harvey v. Commissioner of Soc. Sec. Admin.</u>, 2019
WL 1219153 (D.S.C. Mar. 15, 2019) (unpublished); <u>West v. Berryhill</u>,
No. 18CV92, 2019 WL 362259, at *6 (D. Haw. Jan. 29, 2019)
(unpublished) ("The [c]ourt notes that the Appeals Council also
stated that [the new evidence] would not be exhibited. [The new
evidence], however, can be found in the [administrative transcript]
of this case. Unlike other medical evidence, though, [the new
evidence is] not exhibited in the sense that [it] ha[s] been
assigned an exhibit number, but, instead, placed in that part of

37

the [administrative transcript] concerning 'Documents Related to Administrative Process Including Transcript of Oral Hearing, if applicable.' Nonetheless, as far as this [c]ourt is concerned, [the new evidence is] part of the certified transcript of record in this case. As a result, the [c]ourt may remand this case to the ALJ pursuant to Sentence <u>Four</u> . . . ." (emphasis added) (internal citations omitted)).[13]

Second, unlike in <u>Donald C.</u> and <u>Jones</u>, the Appeals Council here did <u>not</u> explicitly state that it "did not <u>consider</u>" Plaintiff's New MS Evidence. (<u>See</u> Tr. 2, 5-6.) The omission of the "did not consider" language from the Appeals Council's decision suggests that it did consider the New MS Evidence in making its determination that the New MS Evidence did not relate to the period at issue. <u>See</u> <u>Vahey v. Saul</u>, No. 18CV350, 2019 WL 3763436, at *9 (D. Haw. Aug. 9, 2019) (unpublished) (observing that, in other cases, "the Appeals Council had stated that it did not 'consider and exhibit' the evidence; whereas, [in the case before the court],

_____

[13] Indeed, some district courts hold that merely submitting evidence to the Appeals Council, regardless of whether the Appeals Council "considers" or "exhibits" that evidence, makes that evidence part of the official record and outside the purview of a sentence six remand. <u>See</u> <u>Burgos v. Kijakazi</u>, No. 8:20CV2497, 2022 WL 843594, at *4 (M.D. Fla. Mar. 22, 2022) (unpublished) ("As [the p]laintiff submitted the [new evidence] <u>during the administrative proceedings</u>, and the Appeals Council explicitly <u>addressed</u> those records and found that they did not . . . relate[] to the period at issue, no basis for remand under sentence <u>six</u> exists as to the [new evidence]." (emphasis added)); <u>Barbara H. v. Saul</u>, No. 19 CV 50011, 2020 WL 3469163, at *5 (N.D. Ill. June 25, 2020) (holding that merely "present[ing]" new evidence to Appeals Council, regardless of grounds given by Appeals Council for denying review, precludes district court from ordering sentence <u>six</u> remand).

38

the Appeals Council said only that it did not 'exhibit' the evidence").

Third, the applicable regulation requires the Appeals Council to consider new evidence only if the claimant shows "good cause" for failing to submit the evidence at least five days prior to the hearing before the ALJ,[14] and the Appeals Council here did not expressly find that Plaintiff lacked good cause to submit the New MS Evidence (see Tr. 2). If the Appeals Council implicitly found that Plaintiff showed good cause for failing to submit the New MS Evidence to the ALJ, then Section 404.970 required the Appeals Council to consider that evidence. See Vahey, 2019 WL 3763436, at *6 (noting that, "under the new [version of Section 404.970], the Appeals Council could only 'consider' evidence upon a showing of good cause" and, given that Appeals Council's "denial letter [wa]s devoid of any good cause discussion," the possibility existed that

---

[14] The applicable regulation provides, in pertinent part, as follows:

(a) The Appeals Council will review a case if—

. . .

    (5) Subject to paragraph (b) of this section, the Appeals Council receives additional evidence that is new, material, and relates to the period on or before the date of the hearing decision, and there is a reasonable probability that the additional evidence would change the outcome of the decision.

(b) The Appeals Council will only consider additional evidence under paragraph (a)(5) of this section if [the claimant] show[s] good cause for not informing [the Appeals Council] about or submitting the evidence as described in § 404.935 [which requires claimants to submit evidence at least five days prior to the ALJ hearing].

20 C.F.R. § 404.970 (2017) (emphasis added).

"the Appeals Council implicitly found good cause [and ] considered the [new] evidence," thus making the evidence "part of the record"). Under these factual circumstances, the Court should analyze the New MS Evidence under the framework of sentence <u>four</u> of Section 405(g).

"[B]ecause [the Appeals Council] denied review, the decision of the ALJ became 'the final decision of the [Commissioner].'" <u>Meyer</u>, 662 F.3d at 704 (quoting <u>Wilkins</u>, 953 F.2d at 96). A court should "uphold the factual findings underpinning the Commissioner's final decision 'if they are supported by substantial evidence and were reached through application of the correct legal standard.'" <u>Id.</u> (quoting <u>Craig</u>, 76 F.3d at 589). "In making th[at] determination, [the Court] 'review[s] the record as a whole' including any new evidence that the Appeals Council 'specifically incorporated . . . into the administrative record.'" <u>Id.</u> (quoting <u>Wilkins</u>, 953 F.2d at 96). Significantly, the Court "review[s] for substantial evidence the <u>ALJ's decision</u>, not the <u>Appeals Council's denial</u> of [the plaintiff]'s request that the Council review the ALJ's decision due to the newly submitted [evidence]." <u>Wiebusch</u>, 2022 WL 2965653, at *2 n.3. For the reasons explained in more detail below, the Court should find that the New MS Evidence renders the ALJ's decision finding Plaintiff not disabled unsupported by substantial evidence.

40

Most significantly, the ALJ did not find MS even a medically determinable impairment at step two, let alone a severe impairment (see Tr. 20-21), and <u>rejected</u> the MS diagnosis opined by a physician who performed Plaintiff's lumbar puncture based on the following rationale:

> . . . [O]n October 28, 2020, [Plaintiff] underwent an MRI of the head. The findings showed multiple foci of abnormal T2 and FLAIR signal throughout the cerebral hemispheric white matter, which were non-specific and did not show any appreciable change since the July of 2018 study.
>
> Nearly two months later, on December 18, 2020, a lumbar puncture was performed. <u>The post-procedure diagnosis of [MS] was assessed by Mark Boles, M.D. However, [Nurse] Powell later indicated that [Plaintiff]'s work-up was inconclusive with regard to the diagnosis of [MS]</u>.

(Tr. 26 (emphasis added) (internal parenthetical citations omitted).) Thus, the New MS Evidence fills a critical evidentiary gap in the medical evidence of record by providing a more definitive diagnosis of MS to explain the abnormal findings on earlier MRIs of Plaintiff's head that had previously remained unexplained (see Tr. 748 (7/25/18 MRI of the brain reflecting "[m]ultiple small white matter hyperintensities in the subcortical and deep white matter . . . most consistent with chronic microvascular ischemia"), 1399-1400 (10/28/20 MRI of the head showing numerous foci of T2 and FLAIR signal affecting deep and subcortical white matter and a differential diagnosis of small vessel disease versus <u>demyelinating disease</u> versus migraine headaches versus vasculitis)).

41

In <u>Meyer</u>, the Fourth Circuit remanded on the basis of new evidence submitted to the Appeals Council that filled an evidentiary gap in the record, reasoning as follows:

> On consideration of the record as a whole, we simply cannot determine whether substantial evidence supports the ALJ's denial of benefits here. The ALJ emphasized that the record before it lacked "restrictions placed on the claimant by a treating physician," suggesting that this evidentiary gap played a role in [the ALJ's] decision. [The plaintiff] subsequently obtained this missing evidence from his treating physician[,] . . . [and] other record evidence credited by the ALJ conflicts with the new evidence.

<u>Meyer</u>, 662 F.3d at 707. As in <u>Meyer</u>, Plaintiff here has filled the evidentiary gap in the record by supplying evidence containing a more definite diagnosis of MS in lieu of the inconclusive findings in her prior MRIs. (<u>See</u> Tr. 112-15, 121, 748, 1399-1400.)

Moreover, as Plaintiff points out, the MS diagnosis also helps to "explain many of [her] symptoms, including pain, fatigue, weakness, gait disturbance, [and] balance difficulties" (Docket Entry 10 at 19), which "are consistent with her diagnosis of [MS]" (<u>id.</u> at 20 (citing "Multiple Sclerosis, Symptoms and Causes," Mayo Clinic, www.mayoclinic.org/diseases-conditions/multiple-sclerosis/symptoms-causes/syc-20350269)). Indeed, Plaintiff's providers previously could not provide an explanation for many of her persistent and varied symptoms. (<u>See</u> Tr. 841 (orthopedist's remark on 12/15/18 that Plaintiff's symptoms "[were] something that she [wa]s probably going to have to live with" and that she "m[ight] be as good as she gets"), 844 (orthopedist's 11/17/18

42

comment that he "believe[d Plaintiff's] symptoms [we]re real, but [that] there m[ight] not be anything [the orthopedist] could do" to further relieve them), 848 (orthopedist noting on 8/22/18 that objective testing had provided "no explanation for [Plaintiff's] ongoing symptoms"), 1288 (Plaintiff's report to Nurse Powell on 10/9/20 that, "even before [Plaintiff] fell [on November 8, 2017], she would have various non-explained aches and pains and sensory issues" (emphasis added)), 1439 (Plaintiff's statement to Nurse Powell on 11/19/20 that Plaintiff "had various nonspecific symptoms of muscle aching, numbness, and tingling involving the extremities[ t]hat w[ere] probably mild previously . . . and then worsened markedly after [the] fall [on November 8, 2017]" (emphasis added)), 1460 (Nurse Powell's remark on July 1, 2021, that "it [wa]s still unclear what [wa]s causing [Plaintiff's] issues" because the "findings were inconclusive [for MS]" (emphasis added)).)

Another district court recently had occasion to evaluate new evidence that the Appeals Council found did not relate to the period prior the ALJ's decision, and remanded the case because the new evidence provided a definitive diagnosis to explain the plaintiff's progressively worsening symptoms:

> . . . [B]y the time of [the p]laintiff's [neuropsychological follow-up] testing [three months after the ALJ's unfavorable decision], he reported to [his neurologist] that "[he could]n't remember anything" and his memory was "getting worse." Following the testing, [the neurologist] noted that [the p]laintiff was

43

showing a decline in his neuropsychological testing "despite only mildly worsened or stable psychiatric features." [The neurologist] further stated that "[t]he degree of impairment is significant" and that [the p]laintiff needs assistance with his activities of daily living. [The neurologist] upgraded [the plaintiff's] diagnosis to a major neurocognitive disorder (as opposed to the previously diagnosed minor disorder), and noted that the worsening over one year was "suggestive of a progressive neurodegenerative disease." [The neurologist] discussed [the p]laintiff's plans for the future with him, and both [the p]laintiff and his sister indicated he may need to move closer to his sister for more assistance. Although the medical records surrounding the diagnosis are not included in the transcript now before the [c]ourt, a letter submitted by [a n]urse [p]ractitioner . . . indicates that [the p]laintiff was diagnosed by the [neurologist] with early onset Alzheimer's Disease [eight months after the ALJ's unfavorable decision].

. . .

[T]he [c]ourt finds that the new evidence is material, in that [the neurologist]'s . . . report indicates that Plaintiff's condition was "worsening over one year," which was suggestive of a "progressive neurodegenerative disease." Given the ALJ's acknowledgement of [the p]laintiff's deficits, [the neurologist]'s suggestion and [n]urse [p]ractitioner['s ] letter could have influenced the ALJ to decide [the p]laintiff's application differently.

Randall G. v. Commissioner of Soc. Sec., No. 1:20CV1041, 2022 WL 3209584, at *7 (W.D.N.Y. Aug. 9, 2022) (unpublished) (emphasis added) (internal citations omitted); see also Farrell v. Astrue, 692 F.3d 767, 771 (7th Cir. 2012) ("[The new evidence's] materiality is [], in our view, beyond question: the ALJ's decision unequivocally rests in part on the determination that there is no evidence that [a fibromyalgia] diagnosis has been confirmed. [The plaintiff]'s new evidence fills in that evidentiary gap by

providing exactly that confirmation. And this diagnosis, confirmed [one month after the ALJ's denial decision], relates to the period on or before the date of the [ALJ] hearing decision . . . [because i]t builds on the allusions to possible fibromyalgia in [a physician]'s reports [predating the ALJ's unfavorable decision].");
Tribble v. Commissioner of Soc. Sec. Admin., No. 8:20CV2631, 2021 WL 8014690, at *16 (D.S.C. Sept. 30, 2021) (unpublished) (noting that new evidence would relate to the period on or before the ALJ's decision if it showed "some new impairment was diagnosed that was connected to [the p]laintiff's treatment prior to the ALJ's decision"), recommendation adopted, 2022 WL 884238 (D.S.C. Mar. 25, 2022) (unpublished); Ledbetter v. Saul, No. 2:19CV79, 2021 WL 725823, at *6 (M.D. Tenn. Feb. 4, 2021) (unpublished) ("Because of the degenerative nature of disc disease, [the Commissioner]'s argument that the [CT] scan does not relate to the period at issue is unconvincing. The CT scan is objective medical evidence. Had it been available at the time of the hearing, there is a reasonable probability that the ALJ would have assessed [a physician]'s opinion and [the p]laintiff's own [statements] regarding her symptoms more favorably and reached a different decision."), recommendation adopted, 2021 WL 722403 (M.D. Tenn. Feb. 24, 2021) (unpublished).

In sum, the New MS Evidence, when considered as part of the record as a whole, renders the ALJ's denial decision unsupported by

45

substantial evidence.  Accordingly, the Court should remand this matter for further proceedings under sentence _four_ of 42 U.S.C. § 405(g).

### III. CONCLUSION

Plaintiff has established errors warranting remand.

**IT IS THEREFORE RECOMMENDED** that the Commissioner's decision finding no disability be vacated, and that this matter be remanded under sentence four of 42 U.S.C. 405(g) for further administrative proceedings, to include reevaluation by the ALJ of 1) the impact of Plaintiff's headaches on her RFC; and 2) the New MS Evidence and, in light of that evidence, reconsideration of a) which of Plaintiff's impairments qualify as severe; b) whether Plaintiff's impairments meet or medically equal any listings; and c) Plaintiff's RFC.  As a result, Plaintiff's Motion for Summary Judgment (Docket Entry 9) should be granted, and Defendant's Motion for Judgment on the Pleadings (Docket Entry 13) should be denied.

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

May 12, 2023